UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| B. HOWARD SINCLAIR,<br><br>Plaintiff,<br><br>vs.<br><br>CHARTER COMMUNICATIONS, INC. and RICHARD DYKHOUSE,<br><br>Defendants. | ) | Case No. 4:13CV1146 CDP |

**MEMORANDUM AND ORDER**

Plaintiff B. Howard Sinclair filed this suit in Missouri state court against his former employer, Charter Communications, Inc., and its general counsel and senior vice president Richard Dykhouse. In his petition, Sinclair alleged that Charter and Dykhouse discriminated against him because of his age and sex. The defendants removed to this court. Pending before me now are Sinclair's motion to remand and defendant Dykhouse's motion to dismiss. Because I do not find that Dykhouse was fraudulently joined, I will remand the case to state court and will deny as moot the motion to dismiss.

## I. **Background**[1]

Plaintiff Sinclair began working for defendant Charter in April 2006. From December 21, 2009 to October 9, 2012, Sinclair held the position of senior director of human resources. His immediate supervisor was Abby Pfeiffer. Throughout most of Sinclair's tenure at Charter, Pfeiffer held the position of vice president of human resources.

In 2011 and 2012, there were about six or seven employees who reported to Pfeiffer, including Sinclair. Sinclair, who is in his mid-fifties, was the only male employee who reported to Sinclair. He is older than all but one of the other employees who reported to Pfeiffer.

Sinclair alleges that Pfeiffer treated him less favorably than the other employees who reported to her. Pfeiffer also made age-based remarks in Sinclair's presence; selected females over males for new hires or promotions; and "was involved in the termination of older and/or male employees who were replaced by younger and female employees." (Compl., ¶ 13.)

On May 4, 2012, Sinclair sent a letter of complaint about this treatment to Robert Quicksilver, Charter's executive vice president and Pfeiffer's immediate

[1] These facts are taken from Sinclair's complaint. They are considered as true for the purposes of this Memorandum and Opinion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

supervisor. Sinclair requested an investigation of his claims. About a month later, on June 5, 2012, Quicksilver acknowledged Sinclair's letter and informed him that an investigation was being managed by Richard Dykhouse, Charter's general counsel, with the assistance of an outside law firm.

Later that month, Charter announced that it was opening an office in the New York City area and relocating some leadership jobs to the new office. On July 11, 2012, Sinclair received a relocation offer that included a 25% increase to his salary, a substantial cash bonus, and relocation assistance. The offer was conditioned on Sinclair relocating no later than December 31, 2012 and "absent extraordinary circumstances," accepting the offer no later than August 20, 2012. Failure to respond by August 20 would be considered a refusal of the offer. If Sinclair declined the offer, Charter would maintain the right to eliminate his position and consider his eligibility for severance benefits.

On July 26, 2012, Sinclair informed defendants Charter and Dykhouse that he would not be able to respond to the relocation offer while the investigation into his discrimination complaint was ongoing. Later that week, Sinclair received the actual written relocation offer and learned that he would be required to waive any potential claims he had against Charter regarding his employment. Twice, Sinclair contacted the defendants to ask for an extension of the August 20 deadline, citing

the "extraordinary circumstance" of his pending complaint. Defendant Dykhouse responded, telling Sinclair the deadline would not be extended.[2] Sinclair did not sign the agreement, and the defendants never informed him about the outcome of the investigation.

Though some younger, female employees were permitted to decline relocation offers and keep their jobs, Sinclair was not. His job was posted in the New York City area office sometime in September 2012, and eventually another person was hired, though Sinclair told the defendants that he intended to accept that position.

On October 1, 2012, Sinclair filed a charge of age and sex discrimination with the Missouri Commission on Human Rights. A week later, on October 9, Charter placed Sinclair on administrative leave and told him his employment would end on December 31, 2012. The next day, Charter sent an email to employees, alerting them that Sinclair's position had been transferred and the St. Louis position had "been eliminated, effective immediately." Though Sinclair

[2] Although Sinclair pled that both defendants, Dykhouse and Charter, responded to his email, he later clarified that Dykhouse was the individual with whom he communicated. Defendants argue that this amounts to a failure to plead that Dykhouse had any involvement in refusing to extend the August 20 deadline, but I disagree. When a plaintiff pleads that a natural person and a corporation responded to his emails, it seems obvious that the natural person was the one doing the typing.

sought an open position commensurate with his old post, he was not hired. As a result of his termination, he lost severance and stock options.

Sinclair filed suit against Charter and Dykhouse on May 6, 2013, in the Circuit Court of St. Louis County, alleging that the defendants violated the Missouri Human Rights Act, Mo. Rev. Stat. § 213.055 (sex and age discrimination) and § 213.070 (retaliation). Defendants removed the suit to this court and moved to dismiss Dykhouse from this action. Sinclair then moved to remand.

## II. **Discussion**[3]

This federal court has limited jurisdiction. A removing party bears the burden of proving federal subject-matter jurisdiction, and any doubts must be resolved in favor of remand. *In re Bus. Men's Assur. Co. of Am.*, 992 F.2d 181, 183 (8th Cir. 1993). For this court to have jurisdiction based on diversity of citizenship, there must be complete diversity, and the amount in controversy must exceed $75,000, exclusive of costs and interest.[4] 28 U.S.C. § 1332(a); *see also* 28 U.S.C. § 1441(a) (defendant may remove any civil action over which federal district court has original jurisdiction). Diversity is complete if no defendant is a

[3] Because Sinclair's motion to remand is dispositive, I will not address defendant Dykhouse's motion to dismiss, though I have considered the arguments made by both parties in their briefs.
[4] There is no dispute that the amount-in-controversy requirement has been met.

citizen of the same state as any plaintiff. *Walker v. Norwest Corp.*, 108 F.3d 158, 161 (8th Cir. 1997).

At first glance, these statutory requirements are not met. Both plaintiff Sinclair and defendant Dykhouse were citizens of Missouri at the time the petition was filed. (*E.g.*, Notice of Removal, ¶¶ 11, 14.) Nonetheless, the defendants argue that this court has jurisdiction because defendant Dykhouse was fraudulently joined. *See Filla v. Norfolk S. Ry. Co.*, 336 F.3d 806, 809 (8th Cir. 2003) (where plaintiff has joined a non-diverse defendant in its state case, defendants can avoid remand "only by demonstrating that the non-diverse party was fraudulently joined").

Fraudulent joinder is "the filing of a frivolous or otherwise illegitimate claim against a non-diverse defendant solely to prevent removal." *Id.* Under the doctrine of fraudulent joinder, a federal court can ignore the citizenship of a non-diverse defendant for the purpose of assessing jurisdiction if "there exists no reasonable basis in fact and law supporting" the plaintiff's claim against that defendant. *Id.* at 810 (quoting *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 871 (8th Cir. 2002)). However, if there is even a "colorable" claim against the non-diverse defendant – "that is, if the state law *might* impose liability" on that defendant under the facts alleged – there is no fraudulent joinder. *Id.* (emphasis in original); *see also Dorsey*

*v. Sekisui Am. Corp.*, 79 F. Supp. 2d 1089, 1091 (E.D. Mo. 1991) (removing party bears "substantial" burden of proving the alleged fraud).

In this case, the parties disagree over whether Missouri state law might permit a cause of action against Dykhouse under either provision of the MHRA. Dykhouse argues that such a cause of action is prohibited for several reasons: (1) liability for Charter's acts cannot be imputed to Dykhouse, and imputed liability is all Sinclair pled; (2) attorney-client privilege protects Dykhouse from suit; (3) Dykhouse was not Sinclair's supervisor, as required for individual liability under the MHRA; and (4) Dykhouse's actions did not create a tangible change in Sinclair's working conditions and therefore do not constitute an adverse employment action. None of these arguments prevent Sinclair from making a colorable claim against Dykhouse. I will address each in turn.

***A. <u>Missouri Human Rights Act</u>***

Sinclair brings claims against the defendants under two provisions of the MHRA. The first provision, Section 213.055, prohibits employers from discharging or "otherwise" discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment" because of his age or sex. Its expansive definition of "employer" includes "any person directly acting in the interest of an employer." Mo. Rev. Stat. § 213.010(7).

The second provision, Section 213.070, deems it an unlawful discriminatory practice "to retaliate or discriminate in any manner against any other person because such person" has complained about unlawful discrimination prohibited by §213.055.

There was some early confusion about whether the MHRA imposed liability on individuals. But Missouri courts settled the issue several years ago, holding that individuals may be held liable under the MHRA. *See Hill v. Ford Motor Co.*, 277 S.W.3d 659, 669 (Mo. banc 2009). However, only individuals who "directly oversaw or were actively involved in the discriminatory conduct" can face individual liability under the MHRA. *Reed v. McDonald's Corp.*, 363 S.W.3d 134, 139 (Mo. Ct. App. 2012).

***B. Imputed Liability***

Defendants first argue that Dykhouse, as an attorney, cannot be liable under the MHRA for the discriminatory actions of his client Charter. It is not necessary to resort to attorney-client law for this proposition. Under the MHRA, an individual – whether or not he is a lawyer – may only be liable for discriminatory acts he directly oversaw or actively perpetrated. *See id.*

Defendants argue that Sinclair failed to plead that Dykhouse engaged in any discriminatory acts. This is not the case. Sinclair alleged that he and Dykhouse

communicated several times about a potential extension of the August 20 deadline and that Dykhouse and Charter ultimately refused to extend that deadline because Sinclair had complained about sex and age discrimination. (*See* Compl., ¶ ¶ 21, 22, 24, 25, 26, 27, 29.) Sinclair alleged that Dykhouse thereby violated the discrimination and retaliation provisions of the MHRA. (*Id.*, ¶¶ 44, 45.)

Taking the retaliation provision as an example, § 213.070 prevents any individual from retaliating in any manner against someone who has complained about unlawful discrimination. *Keeney v. Hereford Concrete Prods., Inc.*, 911 S.W.2d 622, 624 (Mo. banc 1995) (Section 213.070 uses "exceedingly broad" language). If Sinclair proves that Dykhouse refused to extend the deadline and that refusal was motivated by Sinclair's internal complaint about sex and age discrimination, it is possible that "state law *might* impose liability" on Dykhouse. *Filla*, 336 F.3d at 810. In sum, Sinclair adequately pled that Dykhouse engaged personally in a retaliatory act against him.

***C. Attorney-Client Privilege***

Defendants argue that Sinclair cannot maintain an action against Dykhouse because, as Charter's general counsel, he is "incompetent to testify, his communications are immune from discovery, and he is unable to participate

substantially in this matter given the duties owed to his client as its attorney." (Notice of Removal, ¶ 23.)

Missouri courts have not determined whether an individual can maintain an action against his former employer's in-house counsel under the MHRA. But the recognition that attorney-client privilege includes certain communications between a corporation and its counsel is well-established. *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383, 389–90 (1981). It is also well-established that, in Missouri, an attorney is incompetent to testify about "any communication made to the attorney by such attorney's client in that relation, or such attorney's advice thereon, without the consent of such client." Mo. Rev. Stat. § 491.060(3).

However, neither of these principles insulates in-house counsel from all employment discrimination lawsuits. In fact, the *Upjohn* Court advised courts to determine the applicability of attorney-client privilege on a case-by-case basis. *Id.* at 396 (in finding privilege, Supreme Court focused on fact that communications were made by employees to corporate counsel, who was acting as such; at the direction of corporate supervisors in order to secure legal advice; that the communications concerned matters within employees' corporate duties; and employees were aware they were being questioned in order for corporation to obtain advice). As the parties are aware, attorney-client privilege "only protects

disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Id.* at 395. In this case, it is too early to know what potentially privileged communications Sinclair will seek to prove his case. *See State ex rel. Ford Motor Co. v. Westbrooke*, 151 S.W.3d 364, 367 (Mo. banc 2004) (party asserting attorney-client privilege bears the burden of proving otherwise discoverable information is protected).

To support their contention that Sinclair's claims against Dykhouse cannot proceed, defendants rely on *Cimijotti v. Paulsen*, 230 F. Supp. 39 (N.D. Iowa 1964). In *Cimijotti*, an ex-husband sued his former wife and two other women for conspiracy to damage his reputation, based on statements they had made in a divorce proceeding before the Catholic Church.[5] The court held that "under the circumstances of this case," the women's statements were absolutely privileged under Iowa's priest-penitent privilege. *Id.* at 42. The court cautioned that it was "not holding that it would not be actionable if communicated to other third persons . . . [or] made outside strictly religious activities." *Id.* at 41.

*Cimijotti* is inapposite here for at least two reasons. First, the court was considering a motion for summary judgment, not motions to dismiss or remand, which use different standards. Second, the court relied on uncontested affidavits

[5] Although defendants characterize this case as a lawsuit against a priest, the plaintiff did not sue any priests.

that explained exactly how, when, and to whom the defendants communicated. In fact, counsel for plaintiff had conceded that he had no cause of action if the court found the communications at issue to be privileged. I do not have that type of evidence here.

Defendants also cite several state cases in which in-house attorneys sued their former employers for retaliatory discharge. In all but one of the cases defendants cite, the state court made a case-by-case determination about whether to permit the retaliatory discharge action, based on evidence gathered during discovery.[6]

After these cases, the Third Circuit Court of Appeals decided *Kachmar v. SunGard Data Sys., Inc.*, in which it reversed a district court's dismissal of an in-house counsel's Title VII suit against her former employer. 109 F.3d 173, 186 (3d Cir. 1997). The Third Circuit summarized both state and federal case law, noting that most courts had permitted such suits to go forward, at least in certain circumstances. It found that concerns about disclosure of privileged communications "alone would not warrant dismissing a plaintiff's case, especially where there are other means to prevent unwarranted disclosure of confidential

[6] In fact, in *Gen. Dynamics Corp. v. Superior Court*, 876 P.2d 487, 489 (Cal. banc 1994), one of the cases upon which defendants rely, the California Supreme Court emphasized that dismissal at the pleadings stage "is rarely, if ever, appropriate."

information," such as sealing, protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and in camera proceedings. *Id.* at 181, 182. Ultimately, the *Kachmar* court concluded that it was "premature at this stage of the litigation to determine the range of the evidence [the plaintiff] will offer and whether or how it will implicate the attorney-client privilege." *Id.*; *see also Mason v. Mass. Dep't of Envtl. Prot.*, 774 F. Supp. 2d 349, 363 n.15 (D. Mass. 2011) (without comment on privilege, court permitted former employee to sue in-house general counsel under the FMLA).

I agree with *Kachmar*'s approach. Though Missouri courts have not ruled on this issue – whether in-house counsel is protected from suit under the MHRA – I find that it is possible that Missouri may impose liability. Missouri courts have interpreted the MHRA to create individual liability for discriminatory and retaliatory acts, and there is no statutory indication that in-house counsel should be treated differently from other employees. *Hill*, 277 S.W.3d at 669; *see also Howard v. City of Kansas City*, 332 S.W.3d 772, 784 (Mo. banc 2011).

***D. Supervisory Employees***

Next, defendants argue that Sinclair's suit against Dykhouse should be dismissed because Dykhouse was never Sinclair's supervisor. Defendants contend that the MHRA only creates a cause of action against supervisory employees.

The language of the retaliation provision of the MHRA, § 213.070, is "exceedingly broad." *Keeney*, 911 S.W.2d at 624. In fact, the *Keeney* court concluded that a former employee – already terminated by the time a retaliatory act was alleged to have happened – could sue his former employer under § 213.070. It reversed the lower courts, finding that their conclusion that an employer-employee relationship must exist for plaintiff to bring a retaliation claim was "erroneous." *Id.* at 625.

Although the *Keeney* court noted that it did not need to "explore the outer boundaries of section 213.070," there is nothing in the *Keeney* opinion that makes me believe section 213.070 applies only to supervisors. Indeed, the court wrote:

> Section 213.070 prohibits retaliation "in any manner." To retaliate is to "inflict in return." As used in the statute, retaliation includes any act done for the purpose of reprisal that results in damage to the plaintiff even though the act is not otherwise the subject of a claim in contract or tort. Retaliation does not require that a contractual relationship exist between the alleged victim of retaliation and the alleged perpetrator. It merely requires the commission or omission of an act as a quid pro quo for the filing of a complaint before the Commission. While the statutory language is broad enough to give us pause, it is unambiguous and consistent with the purposes of chapter 213.

*Id.* at 625 (citation omitted). Cases that say MHRA liability is limited to supervisory employees might have done so because, generally, supervisors are the people who have the authority to cause damage to the plaintiff.[7]

Though Dykhouse was not Sinclair's supervisor, he was a supervisor-level employee whom Sinclair alleges retaliated against him. Whether a supervisor-level employee who did not supervise the plaintiff might be held liable under the MHRA is an unsettled question of state law. The question for this court is not whether state law *will* impose liability on Dykhouse, but whether state law *might* might do so. In making this determination, I have "no responsibility to *definitively* settle [an] ambiguous question of state law." *Filla*, 336 F.3d at 811 (emphasis in original). I find it possible that Missouri courts would impose liability on Dykhouse if Sinclair proves that Dykhouse "directly oversaw" the defendants' decision not to extend the deadline; that decision caused him damage; and that decision was based on a retaliatory motive. *See Hayes v. Travelers Indem. Co.*, 4:12CV1233 CAS, 2012 WL 5285775, at *4 (E.D. Mo. Oct. 25, 2012) (finding no

---

[7] Defendants cite two federal district court cases that characterized Missouri case law as limiting MHRA liability to supervisory employees, *Halloran v. Houlihan's Restaurants, Inc.*, 4:11CV1028 DGK, 2012 WL 1667598 (W.D. Mo. 2012) and *Trickey v. Kaman Indus. Technologies Corp.*, 1:09CV26 SNLJ, 2009 WL 1974759 (E.D. Mo. 2009). Neither of these cases analyzed the scope of the retaliation provision of the MHRA and both involved claims against co-employees, rather than superiors with any authority over the terms of the plaintiffs' employment. To the extent that they do not comport with my ruling, I respectfully decline to follow them.

fraudulent joinder where plaintiff joined his HR director, who was not plaintiff's supervisor but had allegedly "advised in" plaintiff's termination).

***E. "Adverse Employment Action"***

Finally, defendants contend that Dykhouse cannot be held liable under the MHRA because he did not take an adverse employment action against Sinclair. Missouri courts have long held that, when interpreting the MHRA, this court can rely on Title VII precedent only if it does not contradict the plain language of the MHRA. *See Hammond v. Municipal Correction Institute*, 117 S.W.3d 130, 136 (Mo. Ct. App. 2003). Although liability under Title VII requires an adverse employment action, the MHRA does not. *See Keeney*, 911 S.W.2d at 625 (Section 213.070 creates a cause of action for "any act done for the purpose of reprisal that results in damage to the plaintiff even though the act is not otherwise the subject of a claim in contract or tort").

Instead, the *Keeney* court held that "retaliation exists under section 213.070 when (1) a person files a complaint . . . and (2) as a direct result, he or she suffers any damages due to an act of reprisal." 911 S.W.2d at 625–26. *See also Gagnon v. Sprint Corp.*, 284 F.3d 839, 850 n.2 (8th Cir. 2002) (recognizing that § 213.070 "prohibits retaliation 'in *any* manner against *any* person' and that this language is broader than that found under Title VII" [emphasis in original]), *abrogated on*

*unrelated grounds as recognized in Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132, 1134 (8th Cir. 2007). I find it possible that Missouri courts *may* impose liability on Dykhouse if Sinclair proves that, because he filed a complaint of discrimination, Dykhouse refused to extend the August 20 deadline, and that "as a direct result," Sinclair suffered damage.

***F. Request for Attorney Fees***

Sinclair has moved, pursuant to 28 U.S.C. § 1447(c), to recover the attorney fees it incurred because of the defendants' improvident removal. Under § 1447(c), "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." Such an award is discretionary, *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005), and granted "only where the removing party lacked an objectively reasonable basis for seeking removal." *Id.* at 141. Although the defendants' arguments that Dykhouse was fraudulently joined were not ultimately persuasive, they do not lack an objectively reasonable basis. Therefore, I will deny Sinclair's motion for attorney fees.

**III. Conclusion**

In short, I do not find that any of the arguments raised by defendants present a barrier to Sinclair making a colorable claim against Dykhouse. Because there

exists a "reasonable basis in law and fact" for Sinclair's cause of action against Dykhouse, I find that Dykhouse was not fraudulently joined. As such, I will remand for lack of jurisdiction to Missouri state court and deny as moot the defendants' motion to dismiss.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion to remand [#11] is granted and defendants' motion to dismiss [#6] is denied as moot. Plaintiff's request for an award of attorney fees and costs is denied.

**IT IS FURTHER ORDERED** that this case is remanded to the Circuit Court of the County of St. Louis, State of Missouri, from which it was removed.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of October, 2013.